Ambro. This is Judge Barry. I've just spoke to him. Thank you very much. Glad to have you. Thank you. Good morning, Presiding Judge Ambro and the members of the Court of Appeals for the United States for the Third Circuit. I'm Theodore Olson on behalf of New Jersey. I would like to reserve, with the court's permission, six minutes for rebuttal. Thank you. The Professional and Amateur Sports Protection Act, PASPA, is a federal mandate that makes it unlawful for a state to license or authorize by law betting on sports. This court must decide what those words mean and whether, as so construed, the law is constitutional. There are essentially two mutually exclusive potential interpretations of PASPA's requirements we submit. First, PASPA may require states to enact or maintain laws making sports wagering illegal. New Jersey argued that such a federal imposition on states would violate the Tenth Amendment by mandating that states regulate their citizens in a manner decreed by Congress. That would conscript and commandeer states into instrumentalities of the federal government. As the Supreme Court held in New York v. United States, Congress may regulate interstate commerce directly. It may not regulate state governments' regulation of interstate commerce. It lacks the power to compel the states to require or prohibit acts that Congress could require or prohibit itself. In order to avoid the Tenth Amendment's restriction on Congress, the Christie I Court adopted the second interpretation of PASPA, holding that under PASPA, states are not required to pass or maintain sports gambling laws. Over 20 times, Christie I declared that all that is prohibited by PASPA is the issuance of gambling licenses or the affirmative authorization by law of gambling schemes. Accordingly, PASPA was constitutional as so interpreted. In the Court's words, we do not read PASPA to require to prohibit New Jersey from repealing its ban on sports wagering. The Christie I Court explained that prohibiting repeal of sports wagering prohibitions would permit Congress to accomplish exactly what the commandeering doctrine of the Tenth Amendment prohibits, by stopping states from repealing an existing law. Nothing, in the words of the Court, nothing in PASPA requires that the states keep any law in place. Interpreted this way, this Court clearly held that PASPA was constitutional. The sports leagues and the federal government understandably, repeatedly embraced and aggressively and unequivocally advocated that interpretation of Christie I's interpretation with respect to PASPA. Here and in the Supreme Court, the leagues unconditionally insisted, nothing in PASPA's unambiguous language compels states to maintain any existing prohibition of sports gambling. The United States agreed, stating in the Supreme Court of the United States, in its opposition to certiorari, New Jersey is free to repeal its sports gambling prohibition in whole or in part. The leagues of the United States and Christie I have embraced this interpretation of PASPA because it is the only construction of PASPA that would allow it to pass the constrictions of the Tenth Amendment. But it may not constitutionally, the Court held, constitutionally require that states keep a ban on sports betting on the books. Congress does not have the authority to do that, to require states to regulate or to keep statutes on the books that would regulate. If Congress could do that, but it may not require the states to do that. New Jersey responded to Christie I by repealing the licensing and regulatory regime that it had adopted in 2012, repealing its prohibitions of sports gambling in the places where it had previously authorized that activity, and expressly decreeing that its repeal did not, expressly in the statute, that the repeal did not authorize or regulate sports betting in these locations. In short, it squarely complied with this Court's interpretation of PASPA. But then Christie II reversed directions and concluded that a repeal of prohibitions did indeed constitute an affirmative authorization in violation of PASPA. But Christie I has squarely and correctly held that decriminalization is not approval or authorization. That would be a false equivalence in the words of this Court. The Court said not prohibiting fishing, the analogy might be not prohibiting fishing from a pier, owning a tractor, or betting on a sports contest is not authorizing by law. When is a repeal an authorization and when is it not? Well, as this Court held in Christie I, we accept that interpretation that when the state is taking laws off the books and not taking a position one way or the other with respect to whether an activity can occur, that is not authorization. How can you support that position in light of the wording of the two sections of the New Jersey Constitutional Amendment that says specifically that it shall be lawful for the legislature to authorize by law? It shall be authorized by law. Our position is, and I think it's quite clear, it's consistent with Christie I, is that what the legislature did not do is authorize anything. It removed prohibitions. It took a position, and it specifically said so. Subsequent to the constitutional change, they passed the law that you label as a repeal. But by passing that law, they authorized by law sports betting at casinos and racetracks. Well, that's squarely inconsistent, I submit, respectfully, with Christie I, because the false equalization argument that the Christie I Court made is absolutely correct. Isn't that saying, though, in fact adopting from your perspective the same binary view of the case that you were checked from the district court? You keep going back, Mr. Olson, in your briefing and here today to the argument that it's either all or nothing. And I'd like you to address, if you would, the issue that was raised in the oral argument before the panel by your friend, Mr. Clement, that the proper way to look at this is by percentages, that there is an in-between, and that at some point a partial repeal is so limited, so targeted, so specific, that it's really just another way of authorizing. Grapple with that. Yes, I would. And thank you for the question. What the state is entitled to do, if it is entitled to repeal some of its prohibitions without violating PASPA, the state has the jurisdiction and responsibility to take those one at a time, if it wishes, to see how that works out. What it is doing, it's ironic, it seems to me, for our opposition to take the position that if you allow more, allow by not criminalizing more betting on sports, that's somehow consistent with PASPA. Let me ask it to you this way. Do you concede that there would be a point at which something that could be characterized as a partial repeal is so definitive in what it allows and doesn't allow that it is really nothing more than authorization in different words? I do not. There's no way to do that? I do not, because I have to go back to PASPA. Either PASPA requires states to have some laws in effect or monitor or restrict sports betting. What if the 2012 law was just framed by an artful drafter in a way that said, we are, in fact, repealing prior law and we are instead going to only allow the following? However you want to frame it. Do you concede that a clever draftsman could couch the 2012 regime as a targeted repeal? Well, I think the courts have dealt with this before and the interpretation that is your responsibility is the state putting its imprimatur, announcing its permission, it's the same as a license, putting a piece of paper in the window saying it's okay. So it doesn't matter that they use the word repeal or they use the word authorize. It's what they do that matters. Is that right? They put their imprimatur on it. It isn't the language that they use to stamp the imprimatur. It's the fact that they do it. Is that correct? Well, the language, of course, embraces what is being allowed. But as Judge Fuentes pointed out in his dissent in Christie II, repealing a law means that it doesn't exist. It is gone. It is erased. But if you agree that what we're looking at is what the act does, not what it's called, and we put aside whether it's a repeal or otherwise, how would the language of the statute be different from language which says, notwithstanding any other provision of law, force wagering shall hereafter be permitted in casinos and racetracks. How is that different from what we have here couched in terms of a partial repeal? Well, I think people can do a lot of things with language, but the language that you just articulated is the state putting its affirmative approval on doing something in a certain place. That's an authorization. So how is that different from the 2014 provision? The 2014 provision announces that the state is neutral on the subject. It is not going to. It's repealed to the extent that force wagering was prohibited before. Therefore, it's repealed such that it shall be permitted hereafter. Is that not the same thing? I think that gets us into the false equivalence that Judge Plankley's opinion talks about. Well, that was totally as to, for instance, prohibition. You repeal prohibition. Is that authorization? We can argue that until the cows come home, but that's not what we have here. Well, I think it is. What we have here is that the state is saying we are not taking a position, and it specifically said so in the legislation. This statute shall not be construed as authorization or permission. Now, the problem- New Jersey cannot dictate to a federal court how we are to interpret or construe. Well, I don't think New Jersey is attempting to do that. It is stating what the import of its statutes are. Reading Christie I carefully and reading the briefs of the United States and reading the briefs of my colleague, Mr. Clement, repealing in whole or in part lifting of prohibition is not authorization. So Christie I is now in play. Pardon me? Christie I is now in play because we're sitting in back. I understand that. I understand that. So the dilemma facing New Jersey is, is Congress requiring us to have laws on the books dealing with sports betting? Now, if Congress is requiring New Jersey to have laws regulating sports betting, that is the Tenth Amendment problem. As the Supreme Court has said repeatedly, in the Prince case and the New York case, and more recently the Chief Justice language in the Sebelius case, the Affordable Care Act case, Congress can require acts to be done or prohibit acts to be done. It may not regulate the state's regulatory activity because then states become instrumentalities or essentially committees of Congress. I'm interested in seeing how this would play out. You know, Nevada has a very comprehensive oversight industry in its sports betting system. How would it work out in New Jersey? Agencies involved in overseeing sports betting, state agencies? State agencies under the 2014 statutes, the state agencies would have no part in it whatsoever. How would it be regulated? It would not be regulated. How would you instill public confidence that this is an honest operation? Well, that's the problem. New Jersey originally approached this issue as saying, gambling is taking place everywhere in New Jersey. We would like to regulate it. We would like to make sure it's honest. We would like to make sure the books are open. We would like to make sure that criminals aren't doing. This court held that it could not be done under FASFA. You're going to call this is going to be a totally deregulated form of sports gambling in New Jersey. As far as New Jersey is concerned. It sounds like FanDuel and DraftKings and the other forms of gambling that are subject to litigation in other circuits, but it sounds like a form of that. Is it not? Well, I don't want to get into whether the Tennessee. I said it sounds like a form of that. Well, I prefer not to get into that entirely other subject because it is a complicated subject. But what New Jersey is saying, Judge Fisher, is we're not having anything to do with it. We're not going to license it. We're not going to control the situation. So someone could open a sports book right across the street from a casino in Atlantic City, and that would be fine? Well, no, because the 2014 statute applies to those places, casinos, racetracks, and former racetracks only. Other laws, such as fraud, such as zoning, such as juveniles, such as gambling in schools, or places like this, although this is a federal jurisdiction, New Jersey has the right as a rational basis to take things one at a time. But if I can't open a sports book across the street from the casino, but I can open one in the casino, New Jersey has authorized me to open one in the casino. Well, that's the dilemma that we're facing today and that New Jersey faces. What can New Jersey do? If Congress is telling New Jersey what to do, if Congress is telling New Jersey that if you allow this to take place in a casino, you must allow it to take place somewhere else, what an irony that would be. What Congress is saying is we're not going to permit you to authorize that by law. And using Judge Hardeman's example, if someone goes to one of the New Jersey casinos and says, look, I know you're not allowed to do this, but I want to rent the front dining room to run a sports book. Okay? Yes. Why would they be allowed to do that? They're allowed to do that because New Jersey has said we have nothing whatsoever to do with your discretion. Because of the law that was passed in 2014. Because there is no law on the books because of the repeal. But if it hadn't been for the 2014 law that was passed, there would be a law on the books. Yes, there would. And so what we understand to be the case is either Congress is telling us, and when I say us, I mean New Jersey, of course, Congress is telling us how and where and what to do with respect to sports betting. That's unconstitutional. Isn't that what New Jersey is doing? New Jersey is saying how and where and with what respect gambling can take place. And that's the problem. It's not that Congress is saying it. It's that Congress has said you've got a choice, as Christy one put it. It may be a hard choice, but you've got a choice. And the choice that New Jersey has gone back to, and the record is pretty clear they've gone back to it deliberately, intentionally, desiring and wanting to help the racetracks and the casinos. They have a purpose. People can think it's laudatory or not. That's not really up to us. But they've got a purpose, and they're pursuing it, and they've been pursuing it aggressively. And we're on the, what, the fourth or fifth iteration of them trying to get to the same point. So, really, the question is, no matter how you draw the lines, there's line drawing to be done here, and New Jersey is doing it in a way that defines where gambling can happen  New Jersey can do those things with respect to what it makes criminal or not, except to the extent that PASCA prohibits it from doing those things. Or some federal law that's properly enacted under the Commerce Clause takes responsibility for that sort of thing. If we need to take a functionalist approach, which I gather you agree with, and the Supreme Court's preemption jurisprudence certainly indicates that's the approach we ought to take, then with a very, very narrow carve-out here, where the only premises that are permitted to conduct sports gambling are those that are licensed and regulated, then why, functionally, isn't this simply, as the United States has suggested, an enlargement of the licenses of those casinos? Because it is not an enlargement of any licenses. New Jersey is not giving permission to anybody to gamble with it. Just saying, as this Court said before, it is not going to prosecute anybody for doing that. Now, I'm not sure, but I don't want to enter into the rebuttal time that I was hoping to reserve. Okay. The issue is, and it's not a preemption case. We've been through that several times. But the casinos are licensed establishments. Yes. And the operators of the casinos have state licenses. Do they not? Yes, casinos do. Now, former racetracks do not, so the statute isn't limited to places where there are licenses. But, Your Honor— But those that are operating the sports betting regime, they would be working within a state-licensed casino. It would be true if they were in a barbershop or in someone's car. New Jersey licenses everything. There's no limitation with respect to—as it should. But the licenses that are granted by the state of New Jersey are activity-specific. None of them relate to sports betting. And New Jersey's statute specifically said, this statute shall not authorize, approve, or be construed in that fashion. And New Jersey has the right to say what it is intending by its statute and what is covered by its statute. That's what it has done. So the idea that it's simply because there's a license and that somehow this is licensing the sports betting is not correct. It is just not— Mr. Wilson, what if— If you're— Go ahead. What if Pennsylvania passed a law tomorrow that said sports wagering shall be allowed in the Commonwealth of Pennsylvania only at its casinos and racetracks? Does that violate past law? Yes. As construed by Christie 1, it would be because— So if you say it directly, it violates past law. But if you pass a broader law and then do a partial repeal that lands you in the exact same place, you don't violate past law. Because we are accepting the language in Christie 1 that is authorization by law that says— That would be an authorization by law. As a follow-up to Judge Hardiman's question, if your position and New Jersey's position is correct, every other state in the country could do the same thing by repealing their prohibitions on sports gambling at wherever, casinos and racetracks or at hotels, wherever they want to do it, if your position is correct. It is. That is my position. And I'm taking that position from Ms. Clark's decision in Christie 1. And the reason— Yeah, but how could you take that position from PASPA? I take that position from PASPA because PASPA either requires states to have laws that regulate sports betting or to leave them alone. Now, what sport— But PASPA was passed on the background that sports betting was illegal in all but Nevada. And I know there was the two other examples. But that was the background. Sports betting was illegal. Now, they conjured up—you know, and I was on the original panel with Judge Fuentes, Judge Van Aske, and, you know, they conjured up this PASPA statutory scheme, which, you know, obviously it had some—it bothered me. I had always done it, but they did it. And they did it, I think, constitutionally. But the background was that sports betting was illegal. And essentially what you're saying is that Congress didn't intend to prohibit states from going out and repealing their prohibitions. Well, we originally looked at PASPA and said, if PASPA is construed as requiring those laws to stay in place, then Congress is telling the states what it must regulate. And that violates the Tenth Amendment. And at the urging of our opponents, the Christie Court said, we can construe the statute in a way that doesn't violate the Tenth Amendment. We will construe it as meaning that those laws don't have to be maintained on the book. Those laws may be repealed in whole or in part, and that will not violate PASPA. That will mean that PASPA is constitutional, but it does mean that states may decriminalize sports betting. And that's the dilemma that New Jersey is in. Thank you. Thank you, Mr. McNeil. Good morning, Your Honors. My name is Ronald Riccio. On behalf of the New Jersey Thoroughbred Horsemen's Association, who are the operators of Monmouth Park Racetrack, I wish to make a few points. First, I'd like to address the comment or question that if the 2014 law is upheld, it will mean that sports betting will be totally deregulated, and it will be totally deregulated by the state. That doesn't mean that it will be the Wild West of sports betting in New Jersey. What it means is that there will be… Just the Wild East? Not even the Wild… I couldn't resist. Sorry. Can I ask you a question? Yes. You've talked in your briefing about self-regulation, but as a practical matter, since these licenses that the casinos and that the tracks have or at one time had, subject them to inspection and control from the gambling commission, is it practical to believe that when those inspectors come on site, if they see something they don't like about what's going on with the sports betting, that that will just be passed silently? No one's going to say, well, we don't have any authority over there. But we have authority over all your operations. And may we just say that we're a little troubled by this? The answer to that question, Your Honor, is in the undisputed factual record, which this is a review of a summary judgment. There are three declarations that are on file in the record from the head of the Division of Gaming Enforcement, from the head of the New Jersey Casino Control Commission, and from the head of the New Jersey Racing Commission. Those three declarations stand unrefuted, and they all say the same thing. When it comes to sports betting in New Jersey, if the 2014 law is upheld, they will be completely hands-off. That doesn't mean the Wild East. What it means is that there will be private self-regulation, as there is in many industries, as our own legal profession, in many ways, is privately self-regulated. Could the Casino Control Act be amended to require that all contractors, as well as all casino operators, are subject to state financial oversight and employee background checks, on the theory that this is just generally applicable? Your Honor, I don't know whether or not it could be amended. I know it hasn't been amended, and I know that what we have in the record are the statements by the head of the Casino Control Commission and Division of Gaming Enforcement and New Jersey Racing Commission, all of which say that, in answer to Your Honor's question, if they're on premises inspecting casino operations or horse racing operations, they're going to have nothing to do with sports betting. In fact, at Monmouth Park, the sports betting venue will be segregated from the horse racing venue. There will be separate proofing. There will be separate identification. It will be operated by the William Hill Agency, the largest sports betting company in the world. It will be policed by private security. There will be signage saying that has nothing to do with the state. This is private property. And they will be able to implement whatever regulations they think are appropriate. If the self-regulation is a travesty, the state's not going to say anything? If the self-regulation is a travesty, Your Honor, then as it would be with any private self-regulation, then the state could at some point down the road hypothetically step in. But that's true for all private self-regulation in the United States. How's it going to be regulated at Garden State Park, which has been grandfathered in when it doesn't even exist anymore, when it's been redeveloped into a multi-use facility? Your Honor, with respect to the former Garden State Park racetrack racecourse. That was grandfathered in, right? No, it's not grandfathered in. Under the 2014 law, the withdrawal of the prohibition applies to current racetracks and former racetrack racecourses, meaning the oval over which the horses used to run. So that particular venue under the 2014 law could operate a sports... But there's no track there anymore. There is no track, but what could happen is... There must still be an oval. It's an oval developed residential and commercial... If a developer wanted to go in and identify the racetrack oval, racecourse oval, it could, if it wanted to, operate a sports betting venue. It would be a substantial investment on the part of the developer, but it could be done. Wholly unregulated. By the state. Wholly unregulated by the state. Well, who would regulate it? In the record, Monmouth Park, a year and a half ago, formed the Independent Sports Wagering Association. This association is going to promulgate, in fact has already promulgated, rules and regulations that will govern the conduct of sports betting at Monmouth Park racetrack. No, we're talking about Garden State. Well, whoever would... Who would regulate that facility? They could form, they could join the association, which I think they would, and if they didn't join the association, then private self-regulation frequently promulgates rules and regulations of its own, and it has an enforcement mechanism, privately, to effectuate the implementation of those rules and regulations. This is nothing new. It happens in the real estate industry. It happens in the oil industry.  It's a perfectly acceptable way to deal with policing activity in a particular industry. Thank you, Mr. Ricciardo. Where does it happen in gaming? Where is private regulation? Your Honor, there are casino associations that are private bodies. I think the New Jersey Casino Association is a private body, not a state body. So private self-regulation can exist in any location, in any format, if that's what the parties choose to do. Thank you, sir. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, and thank you for your prefatory remarks. I would like to start by refocusing on the text of PASPA. The state's constitutional argument proceeds on the premise that PASPA requires 49 states to keep their existing prohibitions on sports gambling on their books. If PASPA actually said that, we could have a lively debate about whether that was consistent with the Court's anti-commandeering principles. But PASPA does not say that. Rather than commanding the states to keep laws on their books, PASPA simply tells states that they cannot do six particular things. They can't sponsor, they can't operate, they can't advertise or promote or license or authorize by law sports gambling. And it also prohibits private individuals from doing four things as well. Such commands for states to not do certain things or not pass certain laws that are inconsistent with federal law and policy are both commonplace and constitutional. States cannot regulate interstate trucking. They cannot dictate airline rates and routes. They cannot dictate what's on the label of a pesticide. They can't issue bearer bonds. They can't make money off of driver's license information, and so on and so forth. There are literally dozens and probably hundreds of laws that tell states that they cannot enact certain laws. And among those, states cannot pass laws licensing or authorizing by law sports gambling. And that does not raise a difficult constitutional question with all due respect. I think that would be obvious if at the time Congress passed statute, the states had no laws on the issue of sports gambling. They had laws neither authorizing nor prohibiting. In that case, if they were told they couldn't authorize sports gambling, what the states would do to comply with PASPA is nothing. They would have to do nothing to comply with PASPA, which is, I think, a sure sign of the absence of a commandeering problem. In the Supreme Court's two commandeering cases, there were problems because states had to take immediate action to comply. Now, I don't think there is anything materially different when, in fact, at the time Congress passed PASPA, that the states had prohibitions against sports gambling on the books. It made it particularly easy for the states to comply. In a sense, they were doubly sure they weren't complying with PASPA because they not only weren't authorizing or licensing sports gambling, they affirmatively prohibited it. And again, in order to comply with PASPA, they had to do nothing, a sure sign of the absence of a commandeering problem. Now, I think that what my friend on the other side would like you to believe is that the only way for the states to comply is to keep those prohibitions on their books. I don't agree with that. I think one way the states could comply is to remove those prohibitions and still not authorize or license sports gambling. I also think there are partial repeals that would be consistent with PASPA. So if a state decided tomorrow that what it wanted to do is simply to not have any criminal penalties on anybody making a wager, whether on sports or anything else, of $1,000 or less with a personal acquaintance, that law, I don't think, would violate PASPA. Now, we could have a debate about it. I think it's actually a closer question than the one you have before you with the 2014 law. But I do think there are partial repeals that would be consistent with PASPA. But as we have said consistently throughout this litigation, not that it really matters at this juncture, but as we have said consistently, not all partial repeals are created equal. And some partial repeals, especially one that leaves a sea of prohibitions and simply carves out literally about a dozen specialized venues, all of which happen to be already associated with state-sponsored gambling and dictates the who, what, and where of the sports gambling that can occur at those venues, that kind of law clearly either licenses or authorizes by law sports gambling in violation of PASPA. And that's the question before the court. Now, to be clear, the reason the 2014 law violates PASPA is not because the preexisting prohibitions were sacrosanct such that any partial repeal would violate them. I think the way to analyze this case is to look at what is the law that's left after the partial repeal. And with all due respect, I don't think anything turns on the order that New Jersey goes about trying to accomplish its objective. It could have fully repealed its gambling laws and then reauthorized all of them except for this little island of these 12 specialized venues, and you would have the exact same result here. What would be a partial repeal that is permissible? Well, I've already offered you one in my opening, Judge Ambrose, and I think that would be the partial repeal that says that, look, we're going to essentially decriminalize and deregulate gambling under $1,000 if it takes place among personal acquaintances. What we're really concerned in this state, frankly what I think Congress was really concerned about in PASPA, is commercial establishments that are engaged in making a living out of sports gambling. Because Congress recognized back in PASPA, and I think we all have to be realistic, no level of government is going to stop a couple of 14-year-olds from having a friendly wager about the outcome of an upcoming game. What I think Congress was concerned about, clearly if you want to look at the Senate report that accompanied PASPA, is the possibility of real state-sponsored, state-authorized gambling, especially in specialized venues like casinos and racetracks. What if the state did exactly as you suggest, repeal all its prohibitions on gambling? It would not violate PASPA. It would not rescind all of its laws against gambling. I don't think it would violate PASPA. I think as a practical matter, if New Jersey did that, Congress might have to revisit the subject, and it might legislate again. But I don't think there's anything sinister that Congress acted against the backdrop of the idea that states probably would not do that. What if it did that, and then chaos of course would ensue? Because children would be gambling, and they would be gambling near schools and so forth, and then the state steps in and decides to regulate the existing laws. It would not violate PASPA either, because PASPA does not forbid a state from regulating activities within its borders. Well, Your Honor, I think that although PASPA doesn't address regulation as such, as I articulated, it prohibits six things. I think a regulatory regime probably would be construed as authorizing by law or licensing gambling. But depending on how it happened, I think it might or might not be a difficult question. What if it repeals all the prohibitions and then passes a law consistent with what Judge Fuentes just asked, and then passes a law that says no minors shall be permitted? Does that violate PASPA? I don't think that if the only prohibition within the state was that there will be no gambling by minors, I don't think that that would violate PASPA. All right, and then the next week they say the elderly can't gamble. Still okay? I would think there might be a constitutional problem with that, Your Honor, but I'm putting that to one side. What if they said that nobody that's carrying credit card debt shall be allowed to gamble? I mean, you see the problem here. What's the neutral principle that we can establish that can vindicate your argument, Mr. Clement? The neutral principle is common sense, and as Judge Jordan alluded to at the prior argument, look, as a starting point, I think around 50% is when you're going to start to look at a partial repeal as being an actual repeal versus really an authorization in the close of a repeal. But aren't we running right into the whole problem of essentially then the federal government telling the state how they must govern in this particular subject matter field? I don't think so, Judge Van Asken. I mean, I know from your first opinion you may be tough to persuade on that, but I don't think so, and here's why. Think of all of the options that the state has. I mean, I've talked about a couple, but New Jersey has a provision that, as I read it, that you become an illegal bookie if you accept five bets for a total of $1,000. Now, they can up that to $10,000. They can modify that. They can decide they're not going to actually go after the bookies. They're only going to go after the commercial establishments that directly profit. There are a variety of things that they can do consistent with the federal regime, and I don't think there's any case out there that says that that's a commandeering problem. I think we have to recognize that commandeering is the exception. The rule is that, pursuant to the supremacy clause, the federal government can tell the states that all sorts of areas are off limits for legislation, and the only two cases that the Supreme Court has held that there is commandeering are the cases where the state had to take immediate action and was either told specifically to enforce a very specified federal regime, or it was said, here's some nuclear waste. Thank you very much. Do something about it. I mean, those are such outlying cases and are so far removed from this, and I think this is much closer to cases like Baker and Reno against Condi, where states had things imposed on them, but they were essentially more in the nature of thou shalt not, not thou shall, and I think in the commandeering context, that does make a difference, and it may seem formalistic, but I think the challenge for Justice O'Connor in New York and Justice Scalia in Prince was there were all sorts of federal laws, and they were trying to come up with a narrow doctrine and not overturn decades and decades of supremacy clause slash preemption cases, so they came up with a very narrow doctrine. Mr. Clement, I have not found any helpful case law support for understanding what authorized by law means, certainly not in this context. So the statute prohibits sponsoring, operating, advertising, promoting, licensing, et cetera, a number of activities, but when it comes to authorizing, the phrase by law is included. I'm tempted to think when it says by law, it means a specific piece of law or legislation, rather than our inferring whether the authorization exists or not. Could you comment on that? Two comments, Your Honor. First of all, I think that the word license is another way to go, and not just on the idea that these are separately licensed establishments, but if you go back to the definition of license, license is a permission for somebody to do something that almost everybody else is prohibited from. That's a classic license. And if the state said there are 12 people, just 12 people, that can engage in sports gambling, and nobody else can, I think anybody looking at it would say, well, those 12 people are licensed to do it, and everybody else is prohibited. I understand the licensing aspect, but why is by law added to authorized? I think it's there because they're focused on the state. You know, both license and authorized by law are the two terms in the statute that appear in the state prohibition, but not in the private individuals. Now, I think what it asks you to do, and I kind of understand the way you came at it in your opinion in Christie 2, was to just look at the 2014 Act, and say I have to look at that law. With all due respect, I think the better way to look at it is you look at all the laws on the books that are left after the 2014 partial repealer, and then you just ask yourself the question, is gambling authorized by law at the casinos and the racetracks? And I submit the answer is absolutely. I can understand why you might say that somehow they aren't authorized by law, but then I think you have to take a step back. Despite the fact that there's no explicit law that authorizes gambling at that location? Sure. It's the holes in the law that prohibits gambling statewide. Or you can look at it as the 2014 law itself. I don't think anything turns on it. My point is you look at the corpus of the laws in New Jersey, and you ask do they authorize sports gambling, and I don't see how you look at those, and you don't say absolutely, and only at the casinos and only at the sports track, and if you at all think that's a close question, then I think if you looked at the Senate report that accompanied PASPA, it is crystal clear that what they are concerned about then is two things. Well, three things. One, which isn't applicable here, is the spread of state-sponsored sports lotteries. The other two things they're concerned about is casino-style sports gambling and racetrack gambling. And racetracks being on tough economic times is nothing new. Twenty-plus years ago, the Florida racetracks were losing money, and there was an effort in Florida to get them sports goals. And that is one of the three phenomena that Congress was looking at and expressly concerned about in PASPA to stop. So with all due respect, I think if you're at the sort of edge of the text, if you took even a peek at the legislative history, it would make clear that this violates PASPA. And I would, with all due respect, suggest this court, I mean, we understand there's an impulse to interpret a statute to avoid constitutional problems, but I think it's a mistake to avoid what I don't think is that serious a constitutional problem at the expense of absolutely gutting the statute. And here, the one thing that Congress doesn't want to have happen is sports books outside of Las Vegas at casinos and racetracks. I'm just curious. One curious point. On that point you just mentioned, what Congress was concerned about, have any of those problems occurred, for example, in Nevada over the years that we haven't had sports gambling? Any of the concerns, any of the problems that Congress had when it enacted PASPA? Have any of those materialized in Nevada? Yes, I think they have, and I think Congress did what Congress does, which is it made a compromise. It didn't, and again, this is clear from the Senate report, which is a very brief and I think instructive read, and what they said about Las Vegas was not that somehow sports gambling in the desert was different because the air was thinner, there wasn't humidity. They said, look, we're not going to, in doing what we want to do here, we're not going to devastate Nevada's economy. So I don't think they said that sports gambling there is not something we're all concerned about. They just made a compromise in the same way that they didn't think that somehow Delaware, uniquely, could have a scratch-off game, and that didn't pose problems. They just said, well, you had one already, we're going to draw a compromise, maybe we need to do it to get a couple of votes. That happens all the time, and I don't think it raises a constitutional problem. If we have, because Christy wanted to, as Judge Rendell noted back in Plano, we're here in bank, I want you to speak to that fundamental issue about requiring the state to go in and regulate activities it does not want to regulate. They, however they framed it, they've said, we don't want to use our law enforcement people to go in and deal with sports betting. Congress, as you correctly pointed out, could have instituted a regime that had the power to do that, that wanted to regulate sports betting. Don't Prince and New York tell us that whereas Congress can do that, if it chooses not to, one of its options is not to say to the state, you will do that. Well, isn't this Congress, in effect, I mean it's taken a long time to get it around to somebody digging in on it hard, you know, this set of cases, but it's passed by Congress saying, well, we don't want to set up a regime to do this, but you folks have to do it. You take your police officers, you take your gambling control people, and you send them into casinos and you enforce that, and you take the heat for that politically from your citizens. Your Honor, I would disagree with both the premise and that there's any problem from the premise. The premise I'd like to take issue with is I don't think this is a situation where Congress said, you know, we don't really want to deal with this, so we're going to commandeer state officials and make them do it. Congress dealt with sports gambling through other statutes, including prohibitions on state sports lotteries. The Wire Act is all about sports gambling, so there is a federal criminal prohibition that's directly relevant. And PASPA, I mean, you know, there's no question in New Jersey when somebody says, I'm really hacked off there's not sports gambling in this state. Nobody thinks it's Governor Christie's fault. Everybody says, why don't we have sports gambling here? It's that stupid federal statute that says that we can't have sports, authorized sports gambling in the state. And I don't think it's any different from somebody who says. And who pays for that? I mean, who pays for that enforcement? Is it the federal government? Is it they send an FBI in here? Or is the federal government saying, you send your police in to do that. You send New Jersey, you send your agents in to manage that. It doesn't specify any degree of enforcement. It says, don't authorize it. If New Jersey or some other state wanted to cut its special gambling enforcement unit in half, nothing in PASPA says they can't do that. Could they cut it off completely? In other words, could they get to the same place that they're at now by just saying, as the hypothetical says, positive. Well, we're going to take all the restrictions off and we'll just put a few on. Maybe we won't say it's just at these locations, but we'll say it's only in Atlantic County or it's only here. Would that be okay? It would depend. I think if they only said in Atlantic City, I think I'd be here making the same argument. I think it would be much more difficult because, as Judge Hardiman indicated, in that context the person across the street would also be able to do it. So there are going to be slightly harder cases than this. I think this is the easiest one you're going to get. But I want to be responsive to the full part of your question. And what I want to say is I don't think that's that different a phenomenon when people say, I hate the way that the airlines are messing with my baggage. And they might complain to the governor's office or they might complain to the state AG, and their response is going to be, there's nothing we can do about it. Here's the stupid federal statute, the Airline Deregulation Act. We don't like it much, but there it is. And here's the supremacy clause. If you have any other questions, call your congressman. This isn't any different from that. And then just to finish the second part of your question, I think I've already alluded to it, which is I think if you get back to PASPA, it doesn't say that you have to allocate certain law enforcement resources to this. I can imagine a situation, because I know they desperately want to get sports gambling in these casinos, where they say, all right, well, we're going to prohibit it everywhere, but we're going to put a memo to all the law enforcement agencies that say, look, whatever you do, when you go into the casinos, don't look for sports gambling. If you see it, if you see a sports book, look the other way. If I can get that memo in discovery, I'd probably be here making the same argument. I don't think it's just the legislature that there isn't a world in which the executive could accomplish something that violates PASPA. I think it would be a harder case. Again, I think this is the easy case. And if I could just end with this note, I think that my friends on the other side are frustrated because they see no way that they can accomplish what they want, which is to get sports gambling into the casinos and the racetracks. But with all due respect, I mean, the state of South Carolina desperately wanted to issue bearer bonds. The state of South Carolina desperately wanted to make money off of driver's license information. And I think Judge Fischer, when he was attorney general, desperately wanted to do something about the airlines. And none of them could do it because of federal law and the supremacy clause. Judge Smith and Judge Barry, do you have any questions at all? No, I don't. Thank you. Good. Thank you. Mr. Fischer. Thank you, Judge Ambrose. May it please the court, let me first thank the court for granting our motion for oral argument, although after Mr. Clement is now finished, I'm not sure if it was actually necessary. Although I think you're supposed to stick to the script that you put in writing, right? I'm not going to do that. You're going to try. I'm going to try. What I am going to do is start with a question that was posed to me at Christie 1 by either judge or an attorney. Before you get there, a significant part of your brief was on the district court you thought, by making the choice binary, you could do this or you could do that, went too far. Do you want to explain it on that? I think the district court did go a little far. I have enormous respect for Judge Schiff, but I think he did go too far. I don't think there's a binary choice for exactly the reasons that Mr. Clement just articulated. There are a variety of things that the state of New Jersey can do to tinker with its sports gambling prohibitions. It can, as Mr. Clement pointed out, change the definition of what is or is not criminal. He alluded to the fact that New Jersey has a three-pronged definition, for example, of what bookmaking is. If you do it more than five times in one day for more than $1,000, it's a third-degree offense. If you do it three times over two weeks, it's a fourth-degree offense. Otherwise, it's a disorderly person's offense. If New Jersey wanted to change those definitions, make everything a fourth-degree offense, or make everything a disorderly person's offense, that would be fine. They can repeal various provisions like that. What's very important, I think, is Mr. Olson said— If they did that, how would that affect their objective, their overall objective, of being able to have sports gambling in casinos and racetracks? It wouldn't. It wouldn't. The problem that the state of New Jersey has is that in order to have sports gambling in the casinos in the way they want to do it, they have to do something that PASPA explicitly prohibits. That's different, as I understand it, from the Tenth Amendment question that sort of underlay what Judge Ambrose just asked. I think that if New Jersey wants to just have a sports book in the casinos, the two ways that it's tried to do it are both violative of PASPA, and in neither construction does that violate the Tenth Amendment to the anti-commandeering principles. Mr. Olson, in his brief in Christie II, the original brief before the panel, and then in his argument today and in his own bank petition, repeatedly talks about the, quote, concession, close quote, that the United States made in its opposition brief to cert in Christie I, and says the United States said that New Jersey could repeal in whole or in part. We did say that, but we didn't say they could repeal any partial repeal would be fine. Indeed, if you look at the transcript at the end of the argument in Christie I, I was asked that very question by either Judge Bishop or Judge Goneski, I don't remember which, and the question was, what if New Jersey decided that the only place you could place a bet on the NCAA Final Four was at a casino in New Jersey, would that be okay? And I said, no, that would not be okay, that would violate PASPA. And so that question followed a different question by the court about what would happen, and it follows on what Judge Fuentes just asked, about what would happen if the entire, if the entire corpus of New Jersey law were withdrawn. That's a hard choice, I get that that's a hard choice. New Jersey doesn't want to do that. The reason they don't want to do that, for exactly the reason that you articulated, and Judge Amber recalled now the Wild East and not the Wild West, is because people would be worried there would be bookies on the boardwalk, or people opening sports books across the street from the casinos. New Jersey has done something very different here that actually gives them great comfort for the reason that all of you have articulated, who asked questions about licensing. They have said there's only, really, if you don't count the two closed racetracks, and I'll come back to that in a second, Judge Hardiman, there are basically eight places, ten places where you can have sports gambling, but you have to be hosted. The operation where you're going to have a sports book has to, under the terms of the statute, consent. And what gives New Jersey the comfort that they wouldn't have if the state were to repeal all the gambling, is that those entities are in fact licensed. As Judge Fuentes says, what gives the public confidence? You walk into a licensed casino, you're not going to pay attention to whether you're walking into the sports book that's unregulated, or the casino that is regulated. And, by the way, what's going to happen, none of this has been articulated in the law, but in the affidavit or the declaration put in by the director of the Division of Gaming Enforcement, he talks about exclusion lists. There are exclusion lists that the casinos have. Who's not allowed to come in there? Do we really believe that the casinos are not going to share their exclusion lists with the operators of the sports book that they're contracting with to run that on their premises? It's a little bit like, you know, I'll send my son, who is 12, for a sleepover at somebody's house if I know the parents and trust them to take care of him. And the same thing is true here. The only reason the state of New Jersey is comfortable with a sports book in the casino is because the licensed entities will in fact be overseeing that in some way. They have to sign contracts with them. And they're not going to risk signing a contract with the Gambino family instead of William Hill. They're just not going to do that. And so there is effectively a laying off of the vet by the state of New Jersey to the casinos, almost, I hate to hesitate to say it, a commandeering of the casino's machinery of security and surveillance and operations over the sports book. So what New Jersey is doing would be fine if they did it at 12 new shopping centers rather than at the casinos? Well, it depends how they framed it. But no, they can't then say, if they withdrew all the prohibitions against sports gambling. I still think you'd have an authorized by law problem. You might not have a licensing problem. So you'd say that only a total repeal would work within PASPA? There's no partial repeal? No, partial repeals can happen under PASPA. There are all sorts of laws on the books that New Jersey has regulating sports gambling. They can repeal some number of those, maybe many of them, that don't have the effect of giving the state-authorized imprimatur that PASPA is worried about. What Congress didn't want, Judge McElhinney, Congress didn't want the good housekeeping seal of approval from the state of New Jersey on certain gambling operations. And that's what they got. Do we need to go the repeal and whole partial repeal? Do we need to go that route in order to decide this case? I don't believe you do, Judge. I think the only thing you need to decide is that within the narrow confines of the law that was passed by the state legislature, and they did pass a law repealing something, so they did pass a statute. Within the narrow confines of that law, that they have done two things that PASPA prohibits. They have done, one, they've effectively licensed, whether in terms of enlarging the license, the way we described it in our amicus brief, or in terms of effectively commandeering the license entities to do their work for them, or as authorized by law. The only reason you have to reach that question is if you think that implicates the Tenth Amendment concerns, and I don't think you do for the reasons that Mr. Clement just articulated. No one's talking about the definition. I mean, so often we'll resort to the definition, you know, dictionary definition. And I'm just surprised that it's not been mentioned, the definition of to empower or give a right or authority to act, grant authority, give permission. Would you agree with those dictionary definitions of authorized? Well, I certainly would agree that they are dictionary definitions. I certainly think that your opinion, pick the right ones. Right. I certainly think you picked the right ones, Judge. But I also think, I mean, I'm not, I don't remember at the moment. I think it was Judge Fuentes asked, what's the guiding principle that we would use here? And the answer is common sense. Part of that is a dictionary definition. And I would actually draw the attention of the court to its own language in the Markell opinion, which was the first case that ever involved the PASPA in this court. And this court said that in construing statutes, we consider the statutes overall object in policy and avoid constructions that produce odd or absurd results where they're inconsistent with common sense. On the same subject, do you know why Congress added the phrase bylaw to authorizing, but did not include that for any of the other prohibitions? I don't, Judge. It's not contained in the Senate report. I don't know the answer to that. I assume, I don't have some of the answers, but I will know that in that context, but my first reading is that maybe there should be a law that authorizes. Well, but I think, but I think Mr. Clement actually answered that question quite nicely when he said, look, if you look at the whole body of law, and it's effectively what Judge Rendell's opinion says in Christie too, if you look at the whole body of law and then you carve something out by a repeal, you can't just say it's just repeal. And therefore it has no legal effect that that statute that was passed actually had a legal effect. It gave permission, authorized, license, signed off on, encourages sports gambling in the casinos. And it's not a secret. That's exactly what the members of the legislature said they were doing when they passed it was the entire purpose of the statute. So it's a little bit, I think it's a little bit, it reminds me a little bit of the McRee painting that said, this is not a pipe. It is a pipe. And it's still, and it's not just a repeal, it's an authorization. How is it that there are certain partial repeals that do equate with authorized by law, but there are other partial appeals that don't equate with authorized by law? I mean, either the definition of authorized by law does equate with repeal or partial repeal or it doesn't. I don't understand how that's. That's the false equivalence argument that Mr. Olson was highlighting from the previous opinion. I think the answer is it has to do with intent and context. I don't think that just because something is repealed and I think we agree that if they would repeal, New Jersey would repeal the entire body of sports gambling prohibitions, that would not be an authorization by law under the terms of that would not violate PASPA. But the closer you get to the kind of selective targeted group of entities that you have here where you're clearly saying not just that we sort of like the idea, but we have firmly encouraged, endorsed that. I think you're doing exactly what PASPA was designed to prevent, which is giving the state's imprimatur to that particular set of actors. Before you sit down, does Judge Smith or Judge Ferry have any questions? No. No, thank you. Yes, thank you. If the guidepost we have is tinkering, if that's all that the common sense notion of what's permissible that you suggested would allow, then why don't we have squarely an anti-commandeering problem in that if New Jersey or any state is required to largely keep a ban on its books, then it is using its state resources, its state policing, its regulatory powers, its state requiry to apply those to enforce that ban. If tinkering is the standard and not something more significant in terms of a partial repeal, then don't we run squarely with the Tenth Amendment? First of all, I think perhaps I didn't speak quite as clearly as I would have liked. I don't think tinkering, to use the word that I use, is the only option. I think there are large-scale things that the state could do that would be consistent with the past. Eliminating criminal penalties would be fine. That's not a tinkerer. That's a change. They could do that. They could repeal the entire set of prohibitions. I think that's fine. What the state can't do is either by, in the guise of a reported repeal, or affirmatively say this very small, discrete set of actors, casinos, can have sports gambling on their premises without violating both the letter of PASPA and exactly what Congress intended. I don't think that violates the Tenth Amendment at all. I don't think there's an anti-commandeering problem with that at all, for the reasons that Mr. Clement articulated and we articulated both in our opposition to certiorari in the Supreme Court on Christie I or in our briefs in Christie I or Christie II. Judge Barrett, did you have any questions at all? No, thank you. Thank you very much. Thank you. Thank you, Your Honor. May it please the Court. What I've heard from Mr. Clement and United States Attorney Fishman is exactly illustrative of the problem. Can New Jersey repeal some of its laws? Which ones? Must it be a total repeal? If it has a total repeal, can it adopt a restriction on juveniles, the elderly, or schools, or people that have convictions of felonies? Then it becomes a violation of PASPA. But why not make an argument that what the 2014 law did was really amend existing New Jersey laws that stand in the way of sports gambling? Well, it amended New Jersey law by repealing certain portions of New Jersey law. Except to the extent? Yes, certain portions. And this is what can New Jersey do? There has to be some fine line under the 10th Amendment to the Constitution. What we have here is a vague micromanagement tinkering with what New Jersey can do. I'm not sure that's giving full credit to their argument. They've conceded that you could repeal all of your gambling prohibitions, and that's consistent, is it not, with what the Supreme Court said in Mississippi, where they said, we recognize, of course, that the choice put to the states, that of either abandoning regulation of the field altogether, et cetera. Or the federal government will take it over. The federal government, what can the federal government do? But wait, they said you could abandon the field. Would you address that? Why doesn't that solve any 10th Amendment problem, the fact that they've conceded on the record that you could deregulate it entirely? Well, in the first place, the government initially rejected that notion that there was a binary choice, repeal all or none. That isn't what PASPA does, and that isn't what we're dealing with here. And the Mississippi case there, what the federal government did is give the choice to the states. You may regulate it under these circumstances, or we, the federal government, will take over regulation. That is not what is happening here. The federal government can control, regulate, license, or whatever it wants, prohibit sports betting. It chose not to do that. It chose the states to implement the federal government's decision with respect to sports betting. Congress, I don't think you've answered Judge Harden's question. It's true that everybody seems to agree the binary choice is off the table. The district court's opinion is, as you rightly pointed out in your reply week, nobody's stepping up to that. But the fact that the government and that the leagues have conceded that complete repeal would, in fact, be consistent with PASPA, doesn't that all by itself eliminate your anti-commandeering problem? Because you are not put in a circumstance where you have to do anything. You couldn't choose to do nothing. The state of New Jersey will then have to repeal provisions of its law with respect to juveniles, with respect to zoning, with respect to convicts and so forth. That is the federal government telling the state of New Jersey how to exercise its police power. And we submit that that violates the Tenth Amendment. All this tinkering, all this micromanagement is a violation of the Tenth Amendment. Could Congress say states may not authorize sports wagering at casinos? Congress can say that. Congress can regulate. We're not saying that Congress can't regulate sports betting. We're saying that Congress can't put jobs on New Jersey, use your resources. I heard Mr. Fishman or maybe it was Mr. Clement say, well, you could eliminate all your criminal penalties. Well, is that really the position of the United States government, that it's going to be consistent with PASPA to eliminate the criminal penalties, but you can't eliminate this prohibition? Why do you think Congress didn't say that? Because Congress frequently does that. If it can pass the bucks with respect to the responsibility or the expenses to the states, it does it all the time. But it has to do it within certain parameters. Don't you think it has something to do with Nevada? Pardon me? Don't you think it has something to do with Nevada? It has something to do with Nevada. Yeah. It may have had something. It certainly did have something to do with Nevada. But Congress does this, and when it does it in this way, it puts the responsibility on the states. It violates the Tenth Amendment. That's what the New York v. Prince said. That's what Chief Justice said with support in the Sebelius case. It is a responsibility that the federal government has. Are you really arguing that point? I mean, you're arguing it, but are you? Well, we're arguing it only because our opponents put us back into that position, and Christie, too, put us back into that position. What the state of New Jersey did is it read carefully your opinion in Christie No. 1, and it says, and I will quote, our opponents said, not only can you repeal in whole or in part, but you can lift the enforcement, you have choice with respect to the policies, you do not have to leave on the books any of your prohibitions. So New Jersey took that decision as its word. And the reason why there's really this choice is that New Jersey either can do what it did before, because PASPA, preventing it from doing that in the 2012 statute, has stepped over the line of constitutionality. That would be great. But if New Jersey can't do that because PASPA won't let them do that, but it will let them repeal any provisions of law using its discretion with respect to where and under what circumstances it chooses not to impose criminal penalties on certain activity, that's what New Jersey did in response to this court's first opinion, and then PASPA's constitutional. And everybody says the statute should be and must be interpreted in a way that will avoid the constitutional problems. That's what you did the first time around. New Jersey accepted that. New Jersey has the right to do it, and then PASPA's constitutional. Thank you. Unless Judge Fish-Smith or Judge Berry has any final questions. No, thank you. No, thank you. Thank you very much. Thank you for being counsel. Thank you for your very, very well-presented arguments.